**Sheldon L. Pollock**
**Sandeep Satwalekar**
**Paul G. Gizzi**
**Nicholas Karasimas**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, NY 10004-2616**
**212-336-0077 (Gizzi)**
**gizzip@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                **Plaintiff,**<br><br>       -against-<br><br>KENNETH THOM,<br><br>                                **Defendant.** | **COMPLAINT**<br><br>25 Civ. _____ (   )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Kenneth Thom ("Thom" or "Defendant"), alleges as follows:

**SUMMARY**

1. Between approximately February and August 2024 (the "Relevant Period"), Thom fraudulently raised more than $600,000 from numerous investor victims. After lying to investors about how he would use their money, Thom stole a substantial portion of it.

2. Over several years, Thom built an online following using the monikers "K Money" or "K$." On a website he maintained, Thom described himself as a trading "luminary," a "former Wall Street market maker," and a "beacon of knowledge, guiding and shaping the destinies of the world's most elite traders."

3.      In February 2024, Thom began soliciting members of a Facebook group he ran (the "K$ FB Group") to send him funds that he represented would be pooled in one or more shared accounts (the "Shared Account") and traded on their behalf. While soliciting investors, Thom made material misstatements concerning how he would use the money investors contributed, and trading returns he was supposedly achieving.

4.      In total, Thom raised at least $615,000 from dozens of investors, raising most of that money during February and March 2024. Thom pooled investor funds in a bank account he controlled, transferred a portion of the funds into brokerage accounts, and traded those funds (without much success), primarily in equity options. Thom also misappropriated approximately $235,000 of investor funds, either by transferring money to other bank accounts he controlled or simply using it for personal expenses. Thom spent tens of thousands of dollars on expenses such as luxury goods in Tokyo, an Airbnb rental in Paris, and everyday items like gas, New York City subway fare, and groceries.

5.      As 2024 went on, and Thom continued to misappropriate investor funds, his posts on the K$ FB Group became less frequent, and he eventually stopped responding to investors and the K$ FB Group's administrators, many of whom were also investors.

**VIOLATIONS**

6.      By virtue of the foregoing conduct and as alleged further herein, Thom has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

2

7. Unless Thom is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

9. The Commission seeks a final judgment: (a) permanently enjoining Thom from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Thom to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Thom to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; (d) permanently prohibiting Thom, directly or indirectly, from participating in the issuance, purchase, offer, or sale of any security—other than with his own assets and accounts; (e) permanently prohibiting Thom, directly or indirectly, from acting as or being associated with any broker, dealer, or investment adviser; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act

Section 214 [15 U.S.C. § 80b-14].

11. Thom, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For instance, Thom resided in this District for some or all of the Relevant Period, and he made false and misleading statements to investors and misappropriated investor funds while in this District.

## DEFENDANT

13. **Thom**, age 42, currently lives in Westfield, New Jersey. Thom previously lived in the Bronx, New York, including during some or all of the Relevant Period. Thom passed the Series 7 and 63 exams in or about May 2006. Until approximately June 2008, Thom was associated with five different brokerage firms. In 2011, the Financial Industry Regulatory Authority ("FINRA")[1] suspended Thom's registration as a broker after he failed to pay damages awarded in a FINRA arbitration.

## FACTS

### I. BACKGROUND

**A. Thom's False Online Profile as a Purported Wall Street Veteran and Expert Trader**

14. For several years, Thom has operated websites and social media profiles using the

---

[1] FINRA is a private American corporation that acts as a self-regulatory organization, or "SRO," and regulates member brokerage firms and exchange markets.

monikers "K Money" or "K$."

15. Across the websites and profiles, Thom sought to portray himself as a skilled, experienced securities trader and "Wall Street veteran" with financial expertise.

16. As alleged in more detail below, Thom would later use the online image he had created, and the following he gathered, to perpetrate his fraudulent scheme.

17. Some of Thom's websites and social media profiles are still active, including "kmoneygroup.com." This website portrays Thom as a skilled and experienced securities trader.

18. The homepage displays a mysterious looking, computer-generated image of a person wearing a Venetian mask and a golden robe, studying financial data on a monitor (see screenshot below).



19. Under a heading titled "The Wall Street Veteran," the homepage touts Thom's purported financial expertise as follows:

In the fast-paced arena of financial markets, where fortunes are made and lost in

the blink of an eye, there exists a luminary whose name resonates with unparallelled expertise and wisdom. Known to most as K$, a former Wall Street market maker who has transcended the bustling trading floors to become the beacon of knowledge, guiding and shaping the destinies of the world's most elite traders.

With an illustrious career that has weathered market storms and conquered financial peaks, Mr. K$ has now taken on a new mission: to unlock the secrets of his success and bestow them upon a select group of traders eager to ascend to greatness. In the hallowed halls of his teachings, the world's finest traders gather to harness the power of his insights and shape their own legacies in the thrilling world of finance. Welcome to the realm of K$ Group, where mastery meets mentorship, and the pursuit of excellence knows no bounds.

20. Thom sought to use his self-created image as a Wall Street veteran and expert trader to generate revenue through multiple channels.

21. For example, Thom streamed video content via Twitch, a popular live-streaming service, where he discussed the markets, described his trading strategy, and interacted with followers.

22. In addition, Thom offered one-on-one trading lessons via his website. Thom offered multiple program options, including, for example, six-months of weekly trading lessons for $10,000.

23. Thom also offered a subscription-based service in which he sent periodic trade recommendations. In one such subscription plan, subscribers paid $299 a month to receive up to four daily options trading recommendations.

24. Simultaneously, Thom built a following on various other social media platforms. For instance, Thom maintained the K$ FB Group on Facebook, and he had more than 40,000 followers on Instagram.

### B. Thom's Actual Industry Experience

25. In contrast with the digital image he sought to create, Thom's actual experience in

the securities industry was limited.

26. In particular, Thom was associated with five different brokerage firms during the roughly two-year period between May 2006 and June 2008. In some instances, Thom was only associated with a given brokerage firm for a month or two.

27. In May 2009, Thom was named in a FINRA arbitration proceeding alleging misconduct, including breach of fiduciary duty, misrepresentation, fraud, and deception. *Matter of Holloway v. Thom*, Arbitration No. 09-02623 (FINRA Dispute Resolution). Thom failed to appear in this arbitration. As a result, in November 2010, a FINRA arbitral panel found that Thom was liable for compensatory damages in the amount of $38,902. In January 2011, after he failed to pay the amount ordered, FINRA suspended Thom's registration. The FINRA suspension remains in effect.[2]

28. Thom's limited and dated experience in the securities industry stands in contrast with the image he sought to portray online and which he relied on to solicit investors. As described further below, Thom did not disclose the truth about his background to the investors he solicited.

## II. THOM'S SOLICITATION OF INVESTORS

29. In December 2023, Thom first gauged investor interest in contributing to the Shared Account. Specifically, Thom posted a poll on the K$ FB Group asking whether anyone would be interest in a "subscription where it's a 10K buy in, it trades [E-mini S&P 500 futures contracts]," where Thom would "keep 50% of profit." Approximately 100 people voted in this poll.

---

[2] Under FINRA Rule 8311, a person "subject to suspension" is prohibited from being associated with any FINRA member firm "in any capacity that is inconsistent with the sanction imposed or disqualified status, including a clerical or ministerial capacity."

30. Shortly thereafter, in early February 2024, Thom began actively soliciting investors on the K$ FB Group.

31. Specifically, on February 2, 2024, Thom posted a message with more detailed information about the mechanics of the Shared Account, how individuals could invest, and how he planned to trade.

32. In this post, Thom said that the minimum deposit would be $10,000 (with a few slots available at $5,000). The deposits, however, had to be made in multiple increments, in amounts less than $10,000 "to avoid the IRS flagging it."

33. Thom also posted that he would have "free reign to trade anything [he] wanted, whenever [he] wanted." Thom described certain fees, like a $50 fee for "paperwork," and fees for money sent by wire. Thom explained that he would keep 50% of the profit "to cover taxes and the work."

34. Two investors who were also K$ FB Group moderators had already sent funds on January 29, 2024, but additional investors began sending funds after Thom's February 2, 2024 post.

35. For example, Thom raised approximately $2,500 that same day, and on February 5, 2024, he raised more than $50,000.

36. Thom continued to solicit investors through posts on the K$ FB Group throughout February and March 2024, and individuals continued to send funds to Thom.

37. On March 18, 2024, Thom began posting messages about another purported account, which he referred to as an "options swing shared account" and that he said would begin in April 2024. Consistent with his earlier descriptions, Thom represented that he would equally split profits from this supposed account with investors, with Thom receiving 50% of the profits

8

and the investors receiving the remaining 50%. Thom's post also noted that investors could withdraw from this account once a month.

38. On March 22, 2024, Thom posted another solicitation message, telling the group that "April [was] coming fast for the [options] swing [shared] account." Thom's post also referenced his "50% cut" of the profit and investors receiving "their [percentage] calculation of the total pot."

39. On March 30, 2024, Thom posted a message explaining that he would be focusing more on the Shared Accounts, and that there would be three supposed accounts: (i) a "Swing Trade" account, which Thom said would trade options; (ii) a "Day and Swing Trade" account, which Thom said would trade futures and options; and (iii) a "YOLO" (an acronym meaning "you only live once") account, which Thom said would trade options expiring that day, an hour before market close.

40. As alleged more fully below, despite Thom referring to three separate accounts in his March 30, 2024 post, and in subsequent investor updates, Thom did not, in fact, place investor funds into three separate accounts that utilized different trading strategies.

41. As a result, and for the sake of clarity, this Complaint generally refers to the Shared Account as the vehicle through which Thom pooled investor funds, regardless of what Thom subsequently did with the funds.

42. Most of the investor funds were sent in February and March 2024, with smaller amounts sent in April and May, and a final transfer in August.

43. In some cases, investors wired money directly to a bank account in the name of "MRK Mgt LLC" (the "MRK Account"), an LLC entity that Thom controlled. In other cases, investors sent money to Thom through payment apps, and he then transferred the money to the

9

MRK Account.

44. In total, Thom raised at least $615,000 from more than fifty investors.

45. Based on Thom's representations, investors understood that their money would be pooled, and any profits would be shared, with Thom taking 50% of the profit and the investors sharing the other 50%, on a pro rata basis.

46. Thom's representations to investors led them to understand that any profits realized in the Shared Account would be based solely on Thom's efforts. For example, Thom represented that he maintained complete control over the Shared Account and that he had complete discretion over what to trade, and that his share of the profits was to compensate him for the "work" he was doing.

47. Thom did, in fact, exercise complete and sole control over the Shared Account, and exercised complete discretion over purchasing and selling securities.

48. Because the Shared Account was a collective investment vehicle that would primarily invest in securities, the Shared Account is a pooled investment vehicle pursuant to Advisers Act Rule 206(4)-8(b) [17 C.F.C. § 275.206(4)-8(b)].

### III.    THOM'S UNSUCCESSFUL SECURITIES TRADING

49. In March and April 2024, Thom transferred a portion of the investor funds from the MRK Account into two brokerage accounts, ostensibly for securities trading as promised to investors.

50. Specifically, Thom transferred $125,000 in one brokerage account ("Brokerage Account A") and $50,000 in another ("Brokerage Account B").

51. In addition, Thom deposited a total of $175,000 into Brokerage Account A from his personal accounts at various times between March and August 2024.

52. In total, Thom deposited at most $350,000 into brokerage accounts for securities trading, significantly less than the at least $615,000 he had raised from investors for the purpose of trading in the Shared Account.

53. On the whole, Thom's securities trading was unprofitable, as described below.

54. In Brokerage Account A, Thom primarily traded short-dated options on popular exchange-traded funds that are designed to track market indices, such as the SPDR S&P 500 ETF Trust (SPY) and Invesco QQQ Trust, Series 1 (QQQ).

55. In Brokerage Account A, Thom posted negative trading returns in each month from March through October 2024, until the account was left with a de minimis balance.

56. In Brokerage Account B, Thom primarily traded slightly longer-dated options on a wider range of securities, as compared to the activity in Brokerage Account A.

57. Thom posted relatively small monthly gains or losses in Brokerage Account B and, as of early 2025, the account balance was approximately $75,000, reflecting a total gain of approximately $25,000.

## IV. THOM'S MATERIALLY FALSE OR MISLEADING STATEMENTS

58. The basic premise of Thom's solicitation was that he would place investor funds into the Shared Account, trade on investors' behalf, and share any profits with them.

59. This description, repeated across multiple representations to investors, was materially false.

60. As alleged below, Thom misappropriated a significant portion of investor funds, rather than trading it on their behalf.

61. Indeed, Thom continued to solicit investors even after he had started to misappropriate funds.

62. Thom knew or recklessly disregarded, and in addition should have known, that

11

the statements he made about how the investment funds would be used were materially false.

63. As alleged above, Thom had complete control over investor funds, exercised sole discretion over the Shared Account, and made the decision to actively misappropriate funds.

64. In addition, Thom provided purported "updates" on the performance of the Shared Account that contained materially false or misleading statements concerning his trading performance.

65. Some of these "updates" were included as part of Thom's investor solicitation posts.

66. For example, on March 5, 2024, Thom posted an update on the K$ FB Group that falsely stated that he "did [$]4650 in gains today in the shared account."

67. In reality, Thom's trading on that date resulted in a gain of only a few hundred dollars.

68. As another example, in a post on the K$ FB Group dated either March 20 or 21, 2024, while further soliciting investors to contribute to the Shared Account, Thom falsely stated that he was "[u]p over [$]26k in the shared today."

69. In reality, Thom's trading on March 20, 2024 resulted in a gain of approximately $2,700, and his trading on March 21, 2024 resulted in a loss of approximately $12,370. In any event, Thom's claim that he had made $26,000 was false.

70. Thom knowingly or with reckless disregard, and negligently, continued to make false statements about performance as time went on, misleading investors as to the performance of their investment.

71. For example, on July 3, 2024, Thom posted purported year-to-date returns for the three purportedly separate accounts within the Shared Account: "Swing +32%, DT +4%, YOLO

+120%."

72. But by this point, Thom had lost almost 30% of the investor funds that had been deposited in Brokerage Accounts A and B.

73. Thom knew or recklessly disregarded, and should have known, that these statements about trading performance were false because he alone controlled the Shared Account (and Brokerage Accounts A and B) and knew or recklessly disregarded what the actual performance was.

74. Finally, Thom's presentation of his background was materially misleading.

75. Thom described his purported financial expertise on various websites, including several that were often linked to on the K$ FB Group.

76. As described above, for example, Thom referred on these websites to his "illustrious career" as a Wall Street market maker.

77. This was materially misleading, because, as alleged above, Thom's real-world experience in the financial industry was relatively brief, he had not worked for a brokerage firm for more than fifteen years, and he had been suspended by FINRA in 2011.

78. Thom knew or recklessly disregarded, and should have known, that such descriptions of his background were false and misleading because he knew the true facts about his real-world experience in the financial industry.

V. **THOM MISAPPROPRIATED INVESTOR FUNDS**

79. As alleged above, approximately $615,000 of investor funds were deposited directly or indirectly into the MRK Account.

80. Of that amount, Thom transferred at most $350,000 into Brokerage Accounts A and B for trading.

13

81. Thom misappropriated most of the remainder of the investor funds.

82. Specifically, Thom transferred approximately $158,560 from the MRK Account to other accounts he controlled, and did not then deposit that money into a brokerage account for trading.

83. In addition, Thom used approximately $76,856 of investor funds in the MRK Account for purely personal expenses.

84. These personal expenses included: (a) $6,377 at a luxury goods store in Tokyo; (b) $6,026 for an Airbnb rental, which coincided with Thom telling investors he was in Paris for the 2024 Summer Olympics; (c) $2,724 at Hermès, a luxury goods store; (d) $1,618 at a Korean barbeque restaurant; and (e) thousands of dollars on everyday expenses like gas, the NYC subway, and groceries.

85. In total, Thom misappropriated approximately $235,416 from investors.

## VI. THOM EVADED INVESTORS

86. On June 27, 2024, Thom posted on the K$ FB Group, advising that anyone who wanted to withdraw from the purported "DT" [Day and Swing Trade] account needed to let him know by the following day because, otherwise, "everything is rolling into [end of year]," suggesting that investors would not be able to otherwise withdraw any funds until the end of 2024.

87. Several individuals responded to this post seeking to withdraw their funds and, in the weeks and months that followed, sought information about the status of their withdrawal requests

88. Presumably in response to investor requests to withdraw their funds, Thom sent approximately $29,000 to five investors over the course of one week in late July 2024.

89. Beyond that, Thom did not return any other funds to investors.

90. During this time, Thom generally responded to investor inquiries and concerns with a range of deflections and excuses.

91. Across multiple posts on the K$ FB Group, Thom blamed the investors for delays in processing their withdrawals by, for example, chiding them for not providing the paperwork he deemed necessary.

92. At another point, members of the K$ FB Group were told that Thom purportedly could not communicate because he had been banned from Facebook.

93. As 2024 continued, Thom became less and less active on the K$ FB Group and eventually stopped posting entirely.

94. One investor ("Investor A"), who had been friends with Thom prior to investing, attempted to communicate with Thom by text message.

95. In January 2025, when Investor A told Thom that people were worried about their money, Thom said that he was in Japan "dealing with the aftermath of the earthquake" and did not want to hear about worried investors when he was "dealing with situations."

96. In fact, there are no reports of an earthquake in Japan in January 2025 that caused any significant damage or injuries.

97. Rather than "dealing with" a natural disaster, Thom was on an international jaunt using stolen investor funds.

98. In February 2025, Investor A pointedly asked whether Thom was going to "ditch [Investor A] like that and run off with [Investor A's money] after all these years." Thom did not reply.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

99.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 98.

100.    Thom, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails: (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

101.    By reason of the foregoing, Thom, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

102.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 98.

103.    Thom, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has: (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue

statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

104. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)

105. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 98.

106. At all relevant times, Thom was an investment adviser under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

107. Thom, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

108. By reason of the foregoing, Thom, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FOURTH CLAIM FOR RELIEF
### Violations of Advisers Act Section 206(4) and Rule 206(4)-8(a) Thereunder

109. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 98.

110. At all relevant times, Thom was an investment adviser, under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)], to a pooled investment vehicle, as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

111. Thom, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly, recklessly, or negligently has: (i) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, and/or (ii) engaged in one or more acts, practices, or courses of business that were fraudulent, deceptive, or manipulative, with respect to any investor or prospective investor in the pooled investment vehicle.

112. By reason of the foregoing, Thom, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Thom and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly,

Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Advisers Act Sections 206(1), 206(2) and 206(4) [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## II.

Ordering Thom to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## III.

Ordering Thom to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)];

## IV.

Permanently prohibiting Thom from participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts;

## V.

Permanently prohibiting Thom from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser, provided that for purposes of this injunction, (a) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or

dealer, or is an employee of such broker or dealer, and (b) a person is associated with an investment adviser if such person is a partner, officer, or director of an investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser;

## VI.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
August 21, 2025

*/s/ Paul G. Gizzi*
Sheldon L. Pollock
Sandeep Satwalekar
Paul G. Gizzi
Nicholas Karasimas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
212-336-0077 (Gizzi)
gizzip@sec.gov